(38 South. 698.)

No. 15,635.

GREVE v. NEW ORLEANS & C. R. LIGHT & POWER CO.*

(May 8, 1905.)

STREET RAILROADS—INJURY TO PERSON ON TRACK—EVIDENCE—NEGLIGENCE.

1. The decedent was at a place where he had a right to be, on the track on his way to board a street car.

2. The car of the defendant company, the appliances, and the road were in good order.

3. The car was running at the usual rate of speed.

4. The decedent and his companion were not standing on or dangerously near the track on which the car which collided with decedent was coming up.

5. The decedent suddenly turned and left the place where he was standing, and ran diagonally in the direction of the coming car, and struck the dashboard and was killed.

When he crossed over to the advancing car with which he collided, he was about six feet from the coming car.

*Rehearing denied June 5, 1905.

6. The weight of the evidence sustains the view that it was too late after the decedent came on the track to stop the car and save his life. The following are decisions in point: Snider v. R. R. Co., 18 South. 695, 48 La. Ann. 12; Hoelzel v. R. R. Co., 22 South. 330, 49 La. Ann. 1302, 38 L. R. A. 708; Webster v. R. R. Co., 25 South. 77, 51 La. Ann. 299; Farrar v. R. R. Co., 26 South. 995, 52 La. Ann. 417; Ponsano v. R. R. Co., 26 South. 820, 52 La. Ann. 245.

7. The threatened danger alleged grew out of a misapprehension. The companion remained where the two were standing before the decedent turned and walked back, and was not hurt.

8. The testimony shows that the accident was sudden. The companion of the decedent said, with reference to the latter, "He just turned around for a minute—a second."

The court finds it impossible, in view of the facts, to hold that the motoneer is responsible for the death.

(Syllabus by the Court.)

Appeal from Civil District Court, Parish of Orleans; John St. Paul, Judge.

Action by Mrs. Kate Greve, widow of Louis Langhoff, against the New Orleans & Carrollton Railroad, Light & Power Company. Judgment for plaintiff, and defendant appeals. Reversed.

Dart & Kernan, for appellant. Walter Henry Rogers and Winn Gray Rogers, for appellee.

BREAUX, C. J. Plaintiff, in her own right and as tutrix of her minor children, sued to recover the sum of $30,000 of the defendant. Personal injury, which resulted in the death of her late husband, is the alleged cause of action. Plaintiff's husband was a man of regular habits, a good husband, and kind father. He was 37 years of age, and the father of three children.

On the evening of the 8th of April, 1904, at about 7:30 o'clock, he left his place of business on Fulton street near Common, to return to his home on the Claiborne Street car. He was in the company of his uncle, an elderly man. Together they walked along Fulton to Canal street. They crossed Canal, and came to the first up-town railroad track, over which they walked on to the place known as neutral ground of Canal street.

There is a network of tracks at this place, eight in number. Plaintiff avers that the intersection of Canal and Fulton streets, across the said neutral ground, was selected and set aside by the defendant company for the use of passengers to board their cars. This is the place of the accident.

We sum up the facts upon this point by the statement that it was entirely usual to seek to board the car at the place in question.

This was what the decedent was seeking to do on the evening so fatal to him and his wife and children—that is, to board the car.

The two, the uncle of Langhoff, Charles Langhoff, and the deceased, stopped at the outward rail of the second track rail, waiting until a car (which car was in their front coming from the river) passed. The uncle was on the right, facing the east, and the nephew on his left. At this point, while thus standing, a car was coming on track numbered 1 of the eight tracks in question, and from which the backs of uncle and nephew were turned as they were looking to the advancing car from an opposite direction.

The uncle, as a witness, stated:

"We went as far as the second track rail and stopped there. The car from the river came down, and, while we were stopping there, he stood on the left side of me, and the car came from the woods while we were standing there, and the first thing I looked around—there was no bell or anything ringing—I looked around, the first thing I knew he was underneath the car; the first thing I saw. He just turned around for a minute—a second."

Counsel for plaintiff, in the brief, summarizes the facts by stating that:

"While they were so halted, a car belonging to Carrollton Line passed in their rear, and Langhoff turned around and stepped back, and was knocked down and under the protruding dashboard of the car. He was dragged a distance of thirty to forty feet by the car, and killed."

The accident was quite sudden. We have sought heretofore to state the issue of fact from the standpoint of the plaintiff. Additionally, we will state that the testimony, as usual, was conflicting about the ringing of the bell. The eyesight of the decedent was weak—"affected," to quote the word of the testimony.

On the part of the defense, the motoneer, who, it may be, was influenced by the feeling which prompts men usually to defend their own acts, testified that just prior to the accident he was running at half speed when the car arrived at Fulton street, and that he saw Langhoff coming toward his car; that he hallooed out to him, "Man, where are you going?" and in an instant stopped the car (in a car's length or less). He saw him before he crossed, and that, had he (Langhoff) not jumped back, but had remained standing with his uncle, there would have been no accident; that he was about six feet from Langhoff when he jumped back and came to the car on which this witness (the said motoneer) was. The dashboard struck Langhoff, threw him over, and when the car stopped he was under the life guard.

This testimony of the motoneer is sustained by some corroboration. It is safe to infer that, if the young man had remained standing with his uncle where he was, he would not have been killed. The uncle remained, and was not hurt. On cross-examination this witness (the motoneer) answered:

"Q. How far had you proceeded on Fulton street before this man turned?
"A. He was standing on the other side of Fulton street.
"Q. Why did he jump in front of your car?
"A. I was six feet from the man where he was standing when he jumped into my car.
"Q. On the river side of Fulton street?
"A. Yes, sir.
"Q. And he was on track No. 2?
"A. Yes, sir."

The motoneer had a clear view, after leaving the curve on Tchoupitoulas street, of the uncle and his nephew standing as before mentioned. As they were not on his track, he says he did not deem that it was necessary to take the precaution that he would have taken if they had been on his own track.

The witness Kern (called by plaintiff as witness), who was on the car at the time of the accident, did not actually see the accident. He, however, corroborates the motoneer in the statement that he heard him hallooing as before stated, and that after hallooing the car stopped violently.

This witness adds that it was then that the motoneer began ringing his bell. He came out of the car, and saw the deceased. No wheel had passed over him. The wheel was stopped against his breast. The dashboard and the platform in front of the wheel had passed over him. This witness at first stated that the car was running pretty fast at the time of the accident.

On the cross-examination of this witness it was shown that he had testified before the judge of the city criminal court a short time after the accident, in a case in which the motoneer was called to answer for manslaughter and acquitted, and relative to the rate of speed said:

"Q. At what rate of speed was it running—that is, the car?
"A. Well, I couldn't tell you that. I wasn't paying much attention to the rate of speed.
"Q. I mean comparatively. Was it fast or slow?
"A. Well, I don't know. It seemed to me that it was an ordinary rate of speed; the way that all those cars run.
"Q. Was it running in an unusual or reckless manner?
"A. No, sir; the same that those cars run, with this exception: that the car was a rickerty car, a kind of frollicking car."

Afterward, while a witness in this case, this witness said that he could not state that it was an old and wornout car, and that he did not know whether it was in good or bad order. The witness finally said that the car was running at an ordinary rate of speed.

The body was found lying about 30 feet

away from the spot at which he was struck. The night of the accident was dark. The car was lighted.

The foregoing is a sufficient review of the facts for the purpose of the decision. The jury found for plaintiff, and assessed the damages at $5,000.

The defendant moved for a new trial. In passing upon the motion the trial judge said:

"In this case I do not agree with the jury, being of the opinion that the verdict should have been for the defendant."

But, deeming it advisable, the defendant being in a position to appeal without inconvenience, as nothing would be subserved by putting the plaintiff to another trial, the trial judge refused to grant a new trial. The defendant appeals.

The question falls within narrow limits. The decedent was walking to take his car on the street, and was in all respects acting as any other orderly man of good conduct crossing from one track to the other in order to get to that on which his car ran. He was unquestionably where he had a right to be. He came to a stop, thinking, doubtless, that he should avoid the car in front, when, for reasons not explained by the testimony, he turned to the left, and suddenly crossed over to and in front of the car to which his back had been previously turned.

We have said narrow limits, because we have found no ground upon which to condemn defendant for anything connected with the running of its cars prior to the fatal accident.

There was no defect about the car or the track; the motoneer was at his place; the rate of speed, we infer, was the ordinary. To this point the situation presents no cause for criticism of any kind.

This brings us to a consideration of the facts immediately connected with the accident, in order to ascertain if it could have been avoided.

The deceased must have been taken by surprise. He was confused, and evidently thought that he was in danger from the car coming from the opposite direction. As we read the testimony, he was not in danger. None the less, he rushed to a real danger, and met death. An unanswerable fact is that the uncle, who remained in his position, was not hurt.

Was the motoneer at fault? is the all-important question, for all reduces itself to that one question.

It was his duty to check the rate of speed on discovery of persons on the track, or persons dangerously near the track. Here the decedent was not on the track, nor was he dangerously near it.

The motoneer had no cause to apprehend that he (deceased) would suddenly turn and rush in front of his car. The rush was made in front of the advancing car within a few feet. It was no longer possible to stop the car. It was too late.

The case falls within Knoker v. Canal & Claiborne R. R. Co., 52 La. Ann. 813, 27 South. 279.

Theorizing upon the subject would not add to our conviction. It was a sad fate. The testimony does not show that the motoneer committed a wrong or an act of negligence which justifies us in fastening the responsibility upon him.

It is ordered, adjudged, and decreed that the judgment appealed from is avoided, annulled, and reversed, and that plaintiff's demand be rejected at her costs in both courts.